**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| ANTHONY J. RECHARTE, | ) | NO. CV 15-2261-E |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) | |
| | ) | |
| Defendant. | ) | |

**PROCEEDINGS**

Plaintiff filed a Complaint on March 26, 2015, seeking review of the Commissioner's denial of benefits. The parties filed a consent to proceed before a United States Magistrate Judge on May 20, 2015.

Plaintiff filed a motion for summary judgment on September 23, 2015. Defendant filed a motion for summary judgment on October 19, 2015. The Court has taken both motions under submission without oral argument. See L.R. 7-15; "Order," filed March 30, 2015.

///

**BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION**

Plaintiff asserts disability since March 3, 2011, based on a shoulder injury and alleged psychiatric impairments (Administrative Record ("A.R.") 187-212, 225-26). An Administrative Law Judge ("ALJ") examined the medical record and heard testimony from Plaintiff and a vocational expert (A.R. 28-440).

The ALJ found Plaintiff has severe impairments, <u>i.e.</u>, "affective/mood disorder, [not otherwise specified], and right shoulder AC joint separation with degenerative joint disease" (A.R. 43). The ALJ also found, however, that Plaintiff retains the residual functional capacity to perform a limited range of medium, light, and sedentary work (A.R. 43-44). The ALJ limited Plaintiff to no overhead or over the shoulder reaching with the right upper extremity and to work involving non-public, simple repetitive tasks (A.R. 41, 43-45 (adopting State agency physician's mental residual functional capacity assessment at A.R. 77-86)). The ALJ found that a person with Plaintiff's residual functional capacity could perform a number of unskilled jobs existing in significant numbers in the national economy (A.R. 42-43, 46 (relying on vocational expert testimony at A.R. 71-73)). The ALJ therefore denied disability benefits (A.R. 46-47).

The Appeals Council denied review after considering additional evidence submitted by Plaintiff after the ALJ's decision (A.R. 1-6; <u>see also</u> A.R. 441-56).

///
///

**STANDARD OF REVIEW**

Under 42 U.S.C. section 405(g), this Court reviews the Administration's decision to determine if: (1) the Administration's findings are supported by substantial evidence; and (2) the Administration used correct legal standards. See Carmickle v. Commissioner, 533 F.3d 1155, 1159 (9th Cir. 2008); Hoopai v. Astrue, 499 F.3d 1071, 1074 (9th Cir. 2007); see also Brewes v. Commissioner of Social Sec. Admin., 682 F.3d 1157, 1161 (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation and quotations omitted); see Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006).

> If the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ. But the Commissioner's decision cannot be affirmed simply by isolating a specific quantum of supporting evidence. Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [administrative] conclusion.

Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citations and quotations omitted).

Where, as here, the Appeals Council considered additional evidence but denied review, the additional evidence becomes part of the record for purposes of the Court's analysis. See Brewes v.

Commissioner of Social Sec. Admin., 682 F.3d at 1163 ("[W]hen the Appeals Council considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence"; expressly adopting Ramirez v. Shalala, 8 F.3d 1449, 1452 (9th Cir. 1993)); Taylor v. Commissioner, 659 F.3d 1228, 1232 (2011) (courts may consider evidence presented for the first time to the Appeals Council "to determine whether, in light of the record as a whole, the ALJ's decision was supported by substantial evidence and was free of legal error"); Penny v. Sullivan, 2 F.3d 953, 957 n.7 (9th Cir. 1993) ("the Appeals Council considered this information and it became part of the record we are required to review as a whole"); see generally 20 C.F.R. §§ 404.970(b), 416.1470(b).

## DISCUSSION

After consideration of the record as a whole, Defendant's motion is granted and Plaintiff's motion is denied. The Administration's findings are supported by substantial evidence and are free from material[1] legal error. Plaintiff's contrary arguments are unavailing.

///
///
///

---

[1] The harmless error rule applies to the review of administrative decisions regarding disability. See Garcia v. Commissioner, 768 F.3d 925, 932-33 (9th Cir. 2014); McLeod v. Astrue, 640 F.3d 881, 886-88 (9th Cir. 2011); Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

I.  **Summary of the Relevant Medical Record**

    A.  **Evidence Before the ALJ**

On February 17, 2011, Plaintiff sought treatment from Dr. Russell Alterman of HealthCare Partners Medical Group, complaining of "acute anxiety" that reportedly started approximately two weeks before (A.R. 318). Dr. Alterman prescribed a one-month trial of Alprazolam (Xanax) (A.R. 318). Plaintiff returned to Dr. Alterman on March 18, 2011, reporting that his symptoms had improved since his last visit (A.R. 315). Dr. Alterman assessed "generalized anxiety" and ordered Lexapro with a notation to taper off Plaintiff's Xanax (A.R. 315). Plaintiff had been seen by another provider at the same practice (Dr. Daniel Huynh) just three days earlier seeking a Xanax refill (A.R. 317). Plaintiff was given a refill but Dr. Huynh had then discussed with Plaintiff issues concerning the use/misuse of benzodiazepines, and Dr. Huynh had referred Plaintiff to a psychologist or psychiatrist (A.R. 317).

Plaintiff presented to the emergency room at the Community Hospital of Long Beach on March 27, 2011, assertedly feeling "anxious" and reporting having had "panic attacks" for approximately a month (A.R. 282-92). A drug screen was positive for benzodiazepenes and THC (A.R. 283, 291).[2] While at the hospital, Plaintiff was given Ativan and a prescription for Ativan for "acute anxiety reaction" and then Plaintiff was released (A.R. 283).

---

[2] Yet, Plaintiff denied using marijuana medicinally or recreationally (A.R. 68).

Plaintiff presented as a new patient to Dr. Jasia Hu of Family Health Care of Long Beach on April 12, 2011, reporting "panic attacks" and anxiety, for which he previously had been given Xanax and Ativan (A.R. 313). Plaintiff claimed he did not feel like the Ativan was helping (A.R. 313). Plaintiff had requested a Xanax refill from his primary doctor before going to the emergency room in March but had been denied because he was not then due for a refill (A.R. 313). Dr. Hu diagnosed an anxiety disorder not otherwise specified and shoulder pain, prescribed Zoloft and Xanax, and referred Plaintiff to an orthopedist (A.R. 313-14).

Plaintiff began treatment with psychiatrist Dr. Dharmesh Sheth of Memorial Counseling Associates on April 20, 2011, complaining of anxiety and "panic attacks" for one month (A.R. 296-98). Dr. Sheth diagnosed a panic disorder and prescribed Lexapro, Abilify, Klonopin, and Xanax, and discontinued the Ativan (A.R. 298). When Plaintiff returned on April 27, 2011, Dr. Sheth prescribed Xanax (A.R. 301-02). Plaintiff returned again on June 7, 2011, reporting that he was "okay," and had stopped taking Xanax (A.R. 299-300). Dr. Sheth recommended "supportive therapy" (A.R. 300). Plaintiff returned once more on October 18, 2011, and was then taking Zoloft (A.R. 394).

Plaintiff sought treatment from psychologist Dr. Vera Bell on October 24, 2011, complaining of depression, fearfulness, anger, "panic attacks," anxiety, mood swings, and paranoia (A.R. 322). Dr. Bell opined that Plaintiff had paranoid delusions, impaired concentration, and a depressed mood (A.R. 322). Dr. Bell diagnosed "296.21" (major depressive disorder, single episode, mild), "300.22"

(agoraphobia without history of panic disorder), and "301.01" (possibly paranoid personality disorder (ICD9 301.1) – there is no code for 301.01) (A.R. 322; see also Medical Billing Codes available online at www.ICD9Data.com last visited Nov. 6, 2015)).  Dr. Bell recommended psychotherapy and medications to be prescribed by a psychiatrist (A.R. 322).[3]  Plaintiff returned to Dr. Bell on December 19, 2011, with the same noted complaints (A.R. 320).  Dr. Bell then opined that Plaintiff's concentration was impaired, he was depressed and anxious, and his affect was labile (A.R. 320).  In the place where Dr. Bell's treatment note ordinarily would indicate the date of the next appointment, only the words "will call" appear beside a redaction (A.R. 320).

Dr. Bell completed a "Mental Disorder Questionnaire Form" dated February 13, 2012, accurately indicating that she had seen Plaintiff only twice (A.R. 323-27).  She stated that Plaintiff was tense and "appeared to be a highly stressed individual with a lot of fearfulness" (A.R. 327).  Plaintiff reportedly was about to take a few college classes and had asserted that he "can not work because it is too much for me" (A.R. 327).  Plaintiff was living on his own and doing his own cooking, with help from his mother in paying bills (A.R. 325).  Plaintiff reportedly had been under the psychiatric care of Dr.

---

[3] Dr. Bell provided a letter dated October 26, 2011, indicating she had been Plaintiff's treating psychologist since "October 2011" and that Plaintiff "is seen on a regular basis" (A.R. 391).  In actuality, Dr. Bell had seen Plaintiff only once prior to the date of the letter.  In the letter, Dr. Bell stated that Plaintiff's psychiatric conditions "decrease his capacity to work" (A.R. 391).  Dr. Bell did not detail how or to what degree Plaintiff's capacity to work supposedly had decreased.

1  Jenkins (A.R. 327).  As for Plaintiff's intellectual functioning/
2  sensorium, Dr. Bell reported:

4      [Patient] appears to have average intelligence, no testing
5        has been completed.  His memory is good, concentration and
6        thinking are unusual.  He has poor judgment.

8  (A.R. 326).  Dr. Bell did not explain what she meant by "unusual."
9  Dr. Bell stated that Plaintiff last worked in February of 2011, and
10 "due to anxiety disorder he reports he can not maintain a schedule if
11 working" (A.R. 324).[4]  Nonetheless, Dr. Bell opined that Plaintiff "is
12 able to complete tasks at a slow rate" and could "understand direction
13 but has problems following them [sic]" (A.R. 324).[5]  She gave
14 Plaintiff a "fair" prognosis (A.R. 323).

16    Meanwhile, Plaintiff reported for a psychiatric assessment by Dr.
17 Jenkins at the Mental Health Urgent Care Center in Long Beach on
18 November 22, 2011, complaining of depression, anxiety, and decreased

---

[4]  Plaintiff testified that he could not work because he supposedly had "anxiety and panic attacks" and would have trouble working in a job that "involved being in a social area" (A.R. 59).  Plaintiff said his "panic attacks" are "very random" (A.R. 62).  As of the hearing, Plaintiff was in college and taking an English class that met two times a week (A.R. 57).  Plaintiff said that he went back to school "immediately" after he stopped working and had been a full-time student in the past (A.R. 57).  Plaintiff claimed that his condition was "definitely interfering" with his schooling (A.R. 64).

[5]  The vocational expert opined that if Plaintiff were limited as Dr. Bell reported in her Questionnaire, there would be no jobs Plaintiff could perform (A.R. 73-74 (referencing A.R. 323-27)).

8

focus and interest, but was "stable on meds no S/S (signs and symptoms)" (A.R. 421). Plaintiff claimed stress from school (A.R. 421). His mental status examination was "normal" (A.R. 421). Dr. Jenkins diagnosed "296.3" (major depressive disorder) (A.R. 421). Plaintiff was prescribed Xanax and his Zoloft was increased (A.R. 421). Dr. Jenkins assessed a Global Assessment of Functioning ("GAF") score of "40/45" indicating "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)" (A.R. 421).[6]

Plaintiff returned on December 1, 2011, reporting decreased anxiety and was given refills for Xanax and Zoloft (A.R. 420). Mental status examination again was "normal" (A.R. 420). Dr. Jenkins stated that Plaintiff had "stress or CD issues" (CD History on the form reflects the use of alcohol, amphetamines, cannabis, cocaine, hallucinogens, inhalants, opioids, and sedatives) (A.R. 420). Plaintiff returned to Dr. Jenkins for medication refills on December 27, 2011, January 27, 2012, February 24, 2012, April 20, 2012, May 18, 2012, June 15, 2012, July 7, 2012, August 14, 2012, September 11, 2012, October 11, 2012, and November 20, 2012 (A.R. 409-19). Each time, Plaintiff had "normal" mental status examinations and Dr. Jenkins referenced possible "CD issues" (A.R. 409-19). In addition to reporting less anxiety through April 2012, beginning in

---

[6] Clinicians use the GAF scale to rate "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") 34 (4th Ed. 2000 (Text Revision)).

9

May 2012 and continuing thereafter, Plaintiff also reported he was less sad (A.R. 409-20).

State agency psychiatrist, Dr. B.A. Smith, reviewed the available medical record (including Dr. Bell's Questionnaire and two treatment notes, but not Dr. Jenkins' treatment notes) and opined on March 14, 2012, that Plaintiff would be capable of performing at least unskilled non-detailed work in a non-public setting (A.R. 77-109; <u>see also</u> A.R. 82, 84-85). Under the heading "Residual Functional Capacity," Dr. Smith's Case Analysis provides that the questions therein "help determine the individual's ability to perform sustained work activities. However, the actual mental residual functional capacity assessment is recorded in the narrative discussion(s), which describes how the evidence supports each conclusion (A.R. 84). Dr. Smith answered questions indicating that Plaintiff has no significant limitations in his ability to carry out short and simple instructions, but "moderate" limitations in his ability to: (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (4) interact appropriately with the public (A.R. 84-85).

///
///
///
///
///
///
///

**B. Evidence Considered For the First Time by the Appeals Council**

Although the record contains only two treatment notes from Dr. Bell, both dated in 2011,[7] Dr. Bell nonetheless completed a "Mental Residual Functional Capacity Assessment" form in 2013 (A.R. 441-43). This assessment, submitted after the ALJ's adverse decision, purported to be a "current evaluation" as of August 26, 2013 (id.). In this assessment, Dr. Bell indicated Plaintiff was "markedly limited" in every single category of function (A.R. 441-42). Dr. Bell also stated therein:

> [Patient] has difficulty with concentration and persistence. He also has difficulty with understanding. There are issues of emotional regulation and limited coping skills. There are many primary, economic and educational issues.
> [Patient] has disabilities and is unable to function presently in the work environment.

(A.R. 443). Dr. Bell also provided a letter of the same date indicating that Plaintiff is diagnosed with major depression and claiming that Plaintiff is "permanent and totally disabled" (A.R. 456).

///
///

---

[7] As of the time of the hearing on March 20, 2013, Plaintiff's mother reported there were no additional outstanding medical records for Plaintiff other than for continued regular treatment by Dr. Jenkins (A.R. 74-75).

11

1    Dr. Bell reportedly had given Plaintiff a "Millon Clinical
2 Multiaxial Inventory-II/III" on August 16, 2013 (also occurring after
3 the ALJ's adverse decision) (A.R. 446). Dr. Bell did not explain if
4 or how Plaintiff's inventory test results fit with Dr. Bell's residual
5 functional capacity assessment. The inventory reported that Plaintiff
6 "may have endorsed more problems and symptoms than would be determined
7 by an objective review," may have responded as a "cry for help" by
8 endorsing so many problems to get the clinician's attention, or it was
9 possible that Plaintiff was "seriously disturbed by many psychological
10 problems" (A.R. 446-55). Dr. Bell did not offer any opinion
11 concerning the validity of Plaintiff's inventory, but did indicate in
12 several sections of the "interpretive report" that clinical evaluation
13 would be necessary to determine Plaintiff's actual condition. See
14 A.R. 450 ("Patients with elevations on Scale 8A warrant close clinical
15 evaluation."); A.R. 451 ("The clinician needs to determine which
16 [narrative] statements are applicable to the individual patient.");
17 A.R. 451 ("The patient shows some evidence of aggressive traits. It
18 is not possible to determine exactly which ones are manifest, and a
19 clinical interview would be needed for more exact characterization.");
20 A.R. 452 ("Because of the apparent severity of the [schizotypal]
21 disorder, a clinical evaluation is needed to determine if this patient
22 is able to adequately function on a daily basis."); A.R. 452 ("This
23 patient shows some evidence of borderline traits. It is not possible
24 to determine exactly which ones are manifest and a clinical interview
25 would be needed for more exact characterization."); A.R. 454 ("A more
26 thorough clinical evaluation is recommended to determine if there are
27 vegetative signs of depression, psychotic symptoms, and/or suicidal
28 ideation."); A.R. 454 ("A clinical evaluation is suggested to

12

determine which [Post Traumatic Stress Disorder] symptoms are present and the degree of functional impairment."); A.R. 455 ("A more thorough clinical evaluation is recommended to determine the nature, extent, and severity of [a possible thought disorder]."); A.R. 455 ("A more thorough clinical evaluation is recommended to determine if vegetative signs are present [for major depression]."); and A.R. 455 ("A more thorough clinical evaluation is recommended to determine which specific symptoms [of delusional disorder] are present and what kind of clinical intervention is necessary."). Dr. Bell stated: "[t]hrough May, 1994,[8] no published research have [sic] reported a codetype similar to the one obtained from this patient" (A.R. 455).[9]

The Appeals Council denied review, finding that Dr. Bell's August 26, 2013 letter[10] concerned a later time period and did not affect the ALJ's decision that Plaintiff was capable of work during the relevant time period (A.R. 2). The Appeals Council also stated

---

[8] The significance of this date is unexplained.

[9] The Millon Clinical Multiaxial Inventory ("MCMI") is a self-report instrument designed to assess DSM-IV related personality disorders and clinical symptoms. See Nowlin v. Commissioner, Social Sec. Admin., 2009 WL 700128, at *8 n.6 (D. Idaho Mar. 16, 2009). In Nowlin, the claimant's MCMI "suggested a possibility of some exaggeration," which the treating physician indicated could be for "secondary gain or because the person is in fact experiencing inner turmoil." Id. at *8. The treating physician nonetheless attributed the claimant's exaggerated responses to "inner turmoil." Id. The reviewing court found that the claimant's actual reason for his exaggerated responses, "while ultimately unknown, necessarily casts a degree of doubt on the objectivity of [the treating physician's] assessment," particularly when the treating physician's opinions otherwise were "not without challenge." Id.

[10] The Appeals Council erroneously referenced the date of this letter (A.R. 2).

that Plaintiff's new evidence did not provide a basis for changing the ALJ's decision (A.R. 2, 6). As discussed herein, the Court agrees that none of the new information from Dr. Bell materially undermines the ALJ's decision. Even as augmented, the record contains substantial evidence to support the ALJ's decision, which the Appeals Council's denial of review made the final decision of the Administration.

### II. Substantial Evidence Supports the Conclusion Plaintiff Can Work.

The report of a non-examining, non-treating physician may serve as substantial evidence to support an ALJ's residual functional capacity determination when the report "'is not contradicted by <u>all other evidence</u> in the record.'" <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. 1995) (quoting <u>Magallanes v. Bowen</u>, 881 F.2d 747, 752 (9th Cir. 1989) (emphasis in original)); <u>see also</u> <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002) ("The opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.") (citing <u>Magallanes v. Bowen</u>, 881 F.2d at 751). In the present case, Dr. Smith's opinion is corroborated by other evidence in the record and constitutes substantial evidence to support the ALJ's conclusion that Plaintiff can work.

As indicated above, Dr. Smith acknowledged Plaintiff's "moderate" limitations in concentration, persistence, and pace, but found Plaintiff capable of performing unskilled non-public simple repetitive tasks. As Plaintiff concedes, Dr. Bell's analysis at the time of Dr.

1  Smith's review similarly indicated that Plaintiff was capable of
2  completing tasks, albeit at a slow pace.  See Plaintiff's Motion,
3  p. 7.[11]

5  As the Appeals Council reasonably determined, Dr. Bell's
6  "current" assessment post-dating the ALJ's adverse decision is not
7  persuasive evidence to alter the decision.  As discussed herein, the
8  record evidence amply supports Dr. Smith's findings and the ALJ's
9  decision.  Additionally, assuming arguendo Dr. Bell's post-decision
10 assessment could be probative of the relevant time period, the
11 assessment manifestly is not based on adequate clinical or diagnostic

---

[11]    To the extent Plaintiff may argue that Dr. Bell's opinions conflicted with Dr. Smith's findings, the ALJ provided specific, legitimate reasons for rejecting Dr. Bell's opinions. The ALJ properly stated that Dr. Bell's opinions were conclusory, not corroborated by medical analysis, rationale or justification, and not supported by Dr. Bell's own findings.  See A.R. 37; see also Valentine v. Commissioner, 574 F.3d 685, 692 (9th Cir. 2009) (an ALJ must provide "specific, legitimate reasons" based on substantial evidence in the record for rejecting a treating physician's contradicted opinion); Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (conflict between treating physician's assessment and clinical notes justifies rejection of assessment); Batson v. Commissioner, 359 F.3d 1190, 1195 (9th Cir. 2004) ("an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole . . . or by objective medical findings"); Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003) (treating physician's opinion properly rejected where physician's treatment notes "provide no basis for the functional restrictions he opined should be imposed on [the claimant]"); 20 C.F.R. §§ 404.1527(c), 416.927(c) (factors to consider in weighing treating source opinion include the supportability of the opinion by medical signs and laboratory findings, the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship including examinations and testing, whether the opinion is from a specialist about issues related to source's the area of specialty, as well as the opinion's consistency with the record as a whole).

findings: (1) Dr. Bell evidently saw Plaintiff for treatment only twice, and not since 2011; (2) neither Dr. Bell's treatment notes nor any other doctor's treatment notes reflect anything like the "markedly limited" restrictions that Dr. Bell purported to assess in every single category of function; and (3) the self-reported inventory occurring after the ALJ's adverse decision is at best inconclusive and at worst suggestive of exaggeration. Dr. Bell's extreme, unsupported and belatedly submitted opinions do not render the final administrative decision legally erroneous or unsupported by substantial evidence. See generally Brewes v. Commissioner, 682 F.3d 1157, 1163 (9th Cir. 2012); see also Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (Administration properly may reject treating physician's opinions that "were so extreme as to be implausible and were not supported by any findings made by any doctor, including [the treating physician]").

Dr. Smith reviewed the records from Drs. Sheth, Hu, Alterman, and from Plaintiff's emergency room visit (see A.R. 78-82). Nothing in the treatment notes or manner of treatment from these doctors (which primarily consisted of medication management) contradicts Dr. Smith's findings.

Although Dr. Smith did not review the treatment notes from Plaintiff's then treating psychiatrist, Dr. Jenkins, those notes are consistent with Dr. Smith's findings. First, Dr. Jenkins never stated Plaintiff could not work. Second, Dr. Jenkins described Plaintiff as "stable on meds no S/S (signs and symptoms)" (A.R. 409-21). Third, every mental status examination was "normal," and Plaintiff was

1 prescribed only Xanax and Zoloft for his condition (A.R. 409-21).[12]

3 The vocational expert testified that a person with the residual functional capacity Dr. Smith (and the ALJ) found to exist could perform unskilled jobs existing in significant numbers in the national economy (A.R. 71-73).[13] The vocational expert's testimony thus furnishes substantial evidence that Plaintiff is not disabled. See Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988); see also Barker v. Secretary, 882 F.2d 1474, 1478-80 (9th Cir. 1989); see generally Johnson v. Shalala, 60 F.3d 1428, 1435-36 (9th Cir. 1995) (ALJ properly may rely on vocational expert to identify jobs claimant can perform); 20 C.F.R. §§ 404.1520, 416.920.

///
///
///
///
///

---

[12] The Court observes that there is no evidence suggesting that Dr. Jenkins' GAF score of "40/45" for Plaintiff on initial assessment contradicts Dr. Smith's evaluation. As indicated above, Dr. Jenkins' mental status examinations of Plaintiff were all "normal." "GAF scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of a disability." Garrison v. Colvin, 759 F.3d 995, 1002 n.4 (9th Cir. 2014).

[13] The vocational expert testified that a person limited to non-public, simple repetitive tasks – and even further limited to no working in tandem with others, working primarily with objects and not with other people, only occasional interaction with co-workers and supervisors, requiring only a steady as opposed to fast pace – could perform unskilled work as a kitchen helper, hand packager, small products assembler, and sedentary assembler – jobs existing in significant numbers in the national economy (A.R. 71-73).

### III. The ALJ Did Not Materially Err in Determining Plaintiff's Mental Residual Functional Capacity.

Plaintiff contends that substantial evidence does not support the ALJ's mental residual function capacity assessment. Specifically, while Plaintiff takes no issue with the ALJ's finding that Plaintiff can do simple tasks, Plaintiff argues that the ALJ's assessment failed to account for "moderate" concentration, persistence, and pace limitations, which Plaintiff claims would interfere with his ability to work consistently and maintain a regular work schedule. See Plaintiff's Motion, pp. 5-8.

As explained above, however, the ALJ's residual functional capacity assessment necessarily did account for the "moderate" concentration, persistence, and pace limitations that Dr. Smith found to exist. Dr. Smith expressly considered these limitations in determining that Plaintiff could perform unskilled non-public, simple repetitive tasks. See A.R. 77-87 (Dr. Smith's Case Analysis). The ALJ adopted Dr. Smith's residual functional capacity assessment (A.R. 41), which, again, adequately had considered and accounted for Plaintiff's "moderate" limitations. See Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1173-74 (9th Cir. 2008) (ALJ's residual functional capacity limiting claimant to "simple tasks" properly incorporated "moderate" limitations identified by doctors, including those related to pace, attention, concentration, and adaption, where one doctor acknowledged limitations and concluded that the claimant, despite certain deficiencies, could perform simple tasks); see also Hughes v. Colvin, 599 Fed. App'x 765, 766 (9th Cir. 2015) (ALJ's residual

functional capacity assessment accounted for moderate difficulties in social functioning, concentration, and persistence, by restricting the claimant to simple, routine, repetitive tasks in a job where she could work independently with no more than occasional public interaction); Sabin v. Astrue, 337 Fed. App'x 617, 620-21 (9th Cir. 2009) (ALJ properly assessed medical evidence in determining that despite moderate difficulties as to concentration, persistence, or pace, claimant could perform simple and repetitive tasks on a consistent basis); Rodriquez v. Colvin, 2015 WL 1237302, at *6 (E.D. Cal. Mar 17, 2015) ("a moderate limitation in the ability to complete a workday or workweek without interruption is consistent with and properly captured by a limitation to simple repetitive tasks"); McLain v. Astrue, 2011 WL 2174895, at *6 (C.D. Cal. June 3, 2011) ("[m]oderate mental functional limitations . . . are not per se disabling, nor do they preclude the performance of jobs that involve simple, repetitive tasks") (citations omitted); compare Brink v. Commissioner of Social Sec. Admin., 343 Fed. App'x. 211, 212 (9th Cir. 2009) and Brink v. Commissioner of Social Sec. Admin., 599 Fed. App'x. 657, 658 (9th Cir. 2015) (finding ALJ failed to capture Brink's functional limits resulting from moderate impairments in concentration, persistence, or pace, when the ALJ's hypothetical to the vocational expert stated only that Brink could perform simple repetitive tasks; no medical expert had translated deficiencies in concentration, persistence, or pace into a residual functional capacity).

    To the extent Plaintiff may argue that the ALJ should have credited the vocational expert testimony that there would be no work for a hypothetical person limited as Dr. Bell opined, no error

occurred. Hypothetical questions posed to a vocational expert need not include all conceivable limitations that a favorable interpretation of the record might suggest to exist - only those limitations the ALJ actually finds to exist. <u>See, e.g.</u>, <u>Bayliss v. Barnhart</u>, 427 F.3d at 1217-18; <u>Rollins v. Massanari</u>, 261 F.3d at 857; <u>Magallanes v. Bowen</u>, 881 F.2d 747, 756-57 (9th Cir. 1989); <u>Martinez v. Heckler</u>, 807 F.2d 771, 773-74 (9th Cir. 1986). The ALJ did not find to exist any limitations beyond those discerned by Dr. Smith.

**CONCLUSION**

For all of the foregoing reasons,[14] Plaintiff's motion for summary judgment is denied and Defendant's motion for summary judgment is granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: November 10, 2015.

/S/
CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE

---

[14] The Court has considered and rejected each of Plaintiff's arguments. Neither Plaintiff's arguments nor the circumstances of this case show any "substantial likelihood of prejudice" resulting from any error allegedly committed by the Administration. <u>See generally</u> <u>McLeod v. Astrue</u>, 640 F.3d 881, 887-88 (9th Cir. 2011) (discussing the standards applicable to evaluating prejudice).